Receipt number AUSFCC-8549605

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SHIRLEY Y. M. CUMMINS, DAVID P. GIAMELLARO, CAROLYN A. GONZALEZ, ALBERT E. MILLER, and ROSA CARMINA RODRIGUEZ, for themselves, on behalf of all persons similarly situated, and as representatives of the plaintiff class certified in *Caraballo v. U.S.*, Civil No. 1997/27 (D. V.I. 2000),<br><br>　　　　　　　　　　Plaintiffs,<br><br>vs.<br><br>The UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Defendant. | No. 23-308 C |

### CLASS ACTION COMPLAINT

Plaintiffs Shirley Y. M. Cummins, David P. Giamellaro, Carolyn A. Gonzalez, Albert E. Miller, and Rosa Carmina Rodriguez, by and through their undersigned counsel, for themselves and as representatives of the class described below, hereby state and allege as follows:

### NATURE OF THE ACTION AND RELIEF SOUGHT

1. In Alaska, Hawaii, and the territories of the United States, termed "non-foreign areas" by the Office of Personnel Management, federal employees and federal retirees receive lower pay raises and lower retirement benefits than their grade-level counterparts in the contiguous 48 states and the District of Columbia, even though the costs of living in these remote areas are far higher. This pattern of discrimination was never intended by Congress. It causes great personal hardship, reduces the effectiveness of the civil service, harms local economies, and undermines national security. Ending and remedying this inequity will improve recruitment, retention, morale,

and productivity of federal employees in non-foreign areas, who are on the front lines of our nation's defenses against foreign threats of all kinds. An effective federal workforce in these unique and strategic areas is vital to national security and other interests of the United States.

2. The named Plaintiffs are current or retired federal employees who lived and worked throughout their careers in non-foreign areas. They bring this action for themselves and on behalf of the Class defined in paragraph 9. They primarily seek monetary compensation, including back pay, interest, attorney fees, and costs of litigation and preparation for litigation, caused by the Defendant's violations of constitutional law and by the Defendant's agencies' violations of statutory law. To provide an entire remedy and to complete the relief afforded by the monetary judgment, the Plaintiffs also seek incidental declaratory and injunctive relief, including (i) immediate step-ups in the regular pay of current employees and in the annuities of retired employees and surviving spouses, (ii) immediate and retroactive increases in agency contributions to the Thrift Savings Plans of Class members, and (iii) remand of appropriate matters to such agencies and officials as may be appropriate, with orders to effectuate the Court's judgment.

## CLASS REPRESENTATIVES

3. Shirley Y. M. Cummins is a citizen of the United States and a resident of Hawaii. She was employed by the United States Department of the Navy in Hawaii from 1977 until August 1, 2009, when she retired. Ms. Cummins holds and asserts claims for underpayment of her regular pay, her retirement annuity, and her agency's TSP contributions.

4. David P. Giamellaro is a citizen of the United States and a resident of Puerto Rico. He began his federal career in 1994 and since 2013 has been employed by the United States Department of State in Puerto Rico. Mr. Giamellaro holds and asserts claims for underpayment of his regular pay and his agency's TSP contributions.

5. Carolyn A. Gonzalez is a citizen of the United States and a resident of California. She has been employed by the Defense Contract Audit Agency since 2002, beginning in California. She was transferred to Hawaii in 2015, where she worked for five years before being transferred back to California in 2020. Ms. Gonzalez holds and asserts claims for underpayment of her regular pay and her agency's TSP contributions.

6. Albert E. Miller is a citizen of the United States and a resident of Nevada. He was employed by the United States Federal Aviation Administration in Hawaii from 1970 until January 3, 2017, when he retired. Mr. Miller holds and asserts claims for underpayment of his regular pay, his retirement annuity, and his agency's TSP contributions.

7. Rosa Carmina Rodriguez is a citizen of the United States and a resident of Puerto Rico. She began her federal career in 1985 in Puerto Rico, where she was employed by the Department of Housing and Urban Development until her retirement on December 31, 2016. Ms. Rodriguez holds and asserts claims for underpayment of her regular pay, her retirement annuity, and her agency's TSP contributions.

## JURISDICTION OF THE COURT

8. This Court has jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491.

## CLASS ACTION CRITERIA

**Class Definition**

9. Plaintiffs bring this action for themselves and as representatives of the class described in this paragraph (the "Class"). The Class comprises: (a) the class which was certified by the District Court in *Caraballo v. U.S.*, Civil No. 1997/27 (D. V.I. 2000) ("*Caraballo*"); (b) all persons who received additional compensation for living costs substantially higher than in the District of Columbia pursuant to the Act of April 20, 1948

(62 Stat. 176), or any subsequent amendment or codification thereof, or pursuant to any executive order, regulation, administrative practice, or contract, at any time on or after April 20, 1948; (c) the surviving spouses of persons described in (a) or (b); and (d) the estates and heirs of persons described in (a), (b), or (c).

**Requirements of RCFC 23(a)**

10. **Numerosity (Rule 23(a)(1)):** There are in excess of 100,000 members of the Class, who are geographically dispersed around the world. Joinder of all Class members is impracticable.

11. **Commonality (Rule 23(a)(2)):** The questions of law and fact that are presented are applicable in common to all Class members. All of the Class members' Salary Claims, as pled below, present identical questions regarding each component of their compensation. All of the Class members' Retirement Claims, as pled below, present identical questions regarding each component of their retirement benefits.

12. **Typicality (Rule 23(a)(3)):** The claims of the named Plaintiffs are typical of those of all members of the Class. They all have experienced (*i*) systematically lower pay raises and lower take home pay, and (*ii*) systematically lower retirement benefits, including lower TSP contributions, lower retirement annuities, or both, than uniformly received by all other federal employees working at the same grade and step of the General Schedule.

13. **Fair and adequate representation (Rule 23(a)(4)):** The named individual Plaintiffs are members of the Class, and they will be able fairly and adequately to represent and protect the interests of the Class. They have retained as counsel of record the undersigned law firm which is experienced in class action litigation and litigation against the United States, including but not limited to class actions involving federal pay in non-foreign areas. The same law firm represented the plaintiff class in the *Caraballo* case and in each of the four previous class

actions, the first beginning in 1981, by federal employees in non-foreign areas. All of these cases were successful and resulted in judgments against the United States.

**Requirements of RCFC 23(b)**

14. **Same treatment (Rule 23(b)(2))**: Defendant has acted or failed to act on grounds generally applicable to the Class.

15. **Common questions predominate (Rule 23(b)(3))**: Common questions of law or fact predominate. On the merits of the claims, there is no relevant question affecting any class member uniquely. Any differences among class members concern either an entire sub-class or the individual calculation of back pay from a common formula.

16. **Superiority of class adjudication (Rule 23(b)(3))**: The Class is large in number and widely dispersed. The prosecution of separate actions by fewer than all members of the Class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant, and that would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair their ability to protect their interests. It would be financially impractical, if not impossible, for Class members to prosecute their claims on an individual basis in non-class suits. A class action is the only available means for the fair and efficient adjudication of this matter in a court of law.

## FIRST COUNT:  SALARY CLAIMS

## UNLAWFUL DISCOUNTS IN ANNUAL PAY RAISES

17. Around 2% of federal civilian employees live and work in the non-foreign areas of the United States (Alaska, Hawaii, and the territories including Guam and Puerto Rico). As a class, they receive lower pay raises and lower retirement benefits than their grade-level counterparts in the contiguous 48 states and the District of Columbia, even though the costs of

5

living in such remote areas are far higher. These disparities are accumulating systematically, and the overall magnitude of federal pay discrimination against non-foreign area employees and retirees has become extreme.

18. Non-foreign areas are strategically located and vital to national defense and homeland security. Large numbers of federal civilian employees in Alaska, Hawaii, and Guam work directly with members of the U.S. Armed Services who are stationed on our military bases in those areas. Others support our soldiers in many essential ways. In all of the non-foreign areas, federal employees are working to prevent illegal immigration, interdict drug traffic, and combat the spread of infectious disease. They are on the front lines of our nation's defenses against foreign threats of all kinds. They deserve equal pay, not discounted pay.

19. The first instance of salary discrimination occurred in 1994, as a result of the ostensible omission of non-foreign area employees from the coverage of the Federal Employees Pay Comparability Act of 1990. The 1994 federal pay raise in the contiguous United States consisted entirely of the first locality payments pursuant to the 1990 Act, averaging 3.95%. There was no increase in General Schedule pay rates, and consequently federal employees in non-foreign areas did not receive a pay raise for 1994. Thus, an "equal pay gap" first appeared in 1994, with a magnitude of 3.95 percent. (The equal pay gap for a given year indicates how much more federal salaries in the contiguous U.S. have increased – cumulatively beginning with 1994 – than federal salaries in non-foreign areas.) In 1995, the equal pay gap widened to 4.55 percent, when employees in the contiguous U.S. received a 2.0% increase in GS pay together with an authorized average increase of 0.6 points in locality pay rates, while employees in non-foreign areas received only the GS increase. In this way, the equal pay gap continued to widen with every increase in locality pay rates, reaching 16.55 percent for 2009.

20. The Non-Foreign AREA Act of 2009, which finally extended locality pay to non-foreign areas, did not change this trend. For example, in 2010, the first year of locality pay in non-foreign areas, employees in the contiguous U.S. received a 2.0% pay raise while employees in non-foreign areas received 1.5%. Accordingly, the equal pay gap widened to 17.05 percent in 2010. Similar disparities occurred in subsequent years. For 2023, the federal pay raise in the contiguous U.S. was 4.6%, but in non-foreign areas it was 4.1%, and the equal pay gap widened to 20.95 percent.

21. Before the 2009 Act, the growing lag in non-foreign area salaries (*i.e.,* the equal pay gap) was due to discriminatory pay raises, which were systematically smaller in non-foreign areas than in the rest of the United States. After the Act, the still-growing lag is the result of salary reductions pursuant to Section 1912, subsection (b), of the Act. Under this subsection, the addition of locality pay to a non-foreign area employee's salary is cancelled out by the subtraction of a commensurate amount of another salary component called COLA. Accordingly, pay increases in non-foreign areas have been limited to rate increases under the General Schedule, just as before. These GS pay increases are not enough to keep up with inflation, much less to reward increases in productivity. As a result, the standards of living of federal employees in non-foreign areas are declining. No such decline has been imposed on federal employees in the rest of the United States, whose take home pay has increased with every increase in locality pay rates as well as every increase in GS rates.

22. In public meetings before the 2009 legislation was enacted, the Office of Personnel Management referred to the subtraction of COLA as "COLA conversion." The two forms of GS supplement – locality pay and COLA – are entirely different in their purposes and methodologies. One cannot be "converted" into the other. In non-foreign areas, both are needed to provide equal

pay for equal work.

23. **Claim One.** The acts and omissions of Congress and the Administration in creating the equal pay gap, and in allowing it to become wider and wider, including (*i*) the omission of non-foreign areas from the locality pay program until 2010 and (*ii*) the enactment of subsection 1912(b) of the Non-Foreign Area Act of 2009, violate the Due Process Clause of the Fifth Amendment to the United States Constitution.

24. **Claim Two.** Subsection 1912(b) of the Non-Foreign AREA Act of 2009, by taking COLA away from then-current employees (as well as from employees hired subsequently), violates the Bill of Attainder Clause of Article One of the United States Constitution.

## SECOND COUNT: RETIREMENT CLAIMS

## UNLAWFUL EXCLUSION OF COLA FROM THE RETIREMENT BASE

25. In 1948, Congress standardized what it called the "salary differential" being paid (since the early 1900's) to federal employees in the territories and possessions of the United States. Later called COLA by President Truman, this differential served to maintain – during almost all of the 20th century, until 1994 – a fair equivalence between the purchasing power of federal salaries in these remote areas and the purchasing power of federal salaries in the contiguous United States. In this way, non-foreign area employees received equal pay for equal work.

26. It is not necessary to go beyond the face of the seminal 1948 statute to understand that Congress intended what it called "additional compensation" payable in non-foreign areas to be included in the retirement base. Prior to the 1948 statute, such additional compensation had been routinely included by administrative decision. In the statute, which applied to employees in foreign countries as well as in non-foreign areas, only the additional amount payable in foreign countries was called an "allowance" and only it was excluded. Congress intended to continue

including the non-foreign salary differential in the retirement base. Moreover, there is abundant external evidence, from before and after the statute was passed, that confirms this conclusion. There is no credible evidence to the contrary.

27. Lower pay raises in non-foreign areas, year after, also have an adverse effect on retirement benefits. High-3 averages of Class members who retired before 2010 are reduced by the disparities described in paragraphs 19 and 20, and this adds to the discount in their retirement annuities compared with employees who retired at same grade and level in the contiguous U.S.

28. Underpayment of retirement annuities, following upon years of underpayment of salaries and other benefits (including Thrift Savings Plan contributions by employing agencies), has led inevitably to steady declines in the living standards of the oldest Class members, as compared with their counterparts in the contiguous U.S. This pattern of discrimination is having untold and tragic consequences – for Class members, their dependents, and their communities – that no amount of back pay can ever repair.

29. In Section 1917 of the Non-Foreign AREA Act of 2009, senior employees – those retiring during 2010, 2011, or 2012 – were allowed to have COLA included in their high-3 averages notwithstanding OPM's practice to the contrary, and thereby to receive larger retirement annuities. The same opportunity was not extended to earlier retirees, who were in far greater need of relief.

30. While the annuities of post-2009 retirees were slightly increased by the 2009 Act, they are still less than required by law. However, pre-2010 retirees are suffering the greatest discrimination of all. Many of them have passed away, and more die every month. Without any General Schedule supplement included in their putative retirement bases (neither locality pay nor COLA), but with costs of living known to be up to 25% higher than in the very high-cost

Washington DC area, the annuities of pre-2010 retirees still living are barely more than one-half of the amounts needed for equivalence with annuities being paid to comparable retirees in the contiguous United States.  Relief is urgently needed.  Current annuity rates must be stepped up, and back pay must be distributed to current annuitants, as soon as possible.

31.     **Claim Three.**  Additional compensation for living costs substantially higher than in the District of Columbia, paid pursuant to the Act of April 20, 1948 (62 Stat. 176), and all subsequent amendments and codifications thereof, including 5 U.S.C. § 5941, is and at all times was an integral part of base pay and basic pay.  The amount of such compensation to be included in the base for calculating retirement annuities, survivor annuities, and other benefits is the amount paid divided by 0.65.

32.     **Claim Four.**  The limitation of the election in Section 1917 of the 2009 Act to employees who retired in 2010, 2011, or 2012 is arbitrary and capricious, and it violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

**PRAYER FOR RELIEF**

**Background**

33.     Back pay in this case should be distributed by class counsel, as it was in previous cases (described below), and not by the Office of Personnel Management or another agency.  Those cases were class actions by various subsets of the Class in this case.  The undersigned counsel for the Class in this case served as lead counsel for the class in each of those cases.  Substantively, the previous cases were concerned with methods of calculating and changing COLA rates, and they did not involve any of the claims in the present case.  However, those cases were like the present case in one important respect.  The Government was not prepared to administer the back pay distributions in the manner needed for prompt and accurate relief.  Instead, at the request of the

Government in each of the previous cases, the undersigned counsel served as trustee for distribution of the monetary recovery. From lump sum payments made by the Government, the trustee calculated and distributed individual payments to class members, attorneys, and others (including OPM). This approach proved more than satisfactory to all concerned. (See paragraph 38.) Similar procedures are necessary in this case. Following is a brief summary of the prior cases.

34. The first case was *Alaniz v. Office of Personnel Management,* 728 F.2d 1460 (Fed. Cir. 1984), now a landmark in administrative law. This case was filed in 1981 in the Federal District Court in Anchorage, Alaska, after OPM (then a brand new agency) reduced the COLA rate for the Anchorage area in two successive years. The agency took the position, ultimately rejected by both the District Court and the Federal Circuit Court of Appeals, that it was not required to give notice or provide an opportunity for federal employees to be heard when it changed the COLA methodology or reduced COLA rates. The appellate court held unanimously that (*i*) OPM's actions violated the Administrative Procedure Act, (*ii*) the rate reductions were null and void, and (*iii*) class members were entitled to recover the amounts by which their salaries had been reduced or underpaid. The distribution of back pay initially was managed by the government. The process proved to be so slow and costly that it was later turned over to class counsel, Robert G. Mullendore, P.S., as trustee. In all of the later cases (described below), at the Government's request, the same law firm has acted as trustee for the resulting distributions.

35. The second case, *Karamatsu v. United States*, No. 224-85C (Fed. Cl.), was filed in the United States Claims Court in 1985 after OPM refused to extend the *Alaniz* principle to the other non-foreign areas. The case was finally settled by the Government's agreement to repay the amounts by which COLA had been reduced in all of the other areas. As in the *Alaniz* case, the

11

Government made lump sum payments to the trustee, who distributed the proceeds to individual beneficiaries. The Claims Court treated the *Karamatsu* case as a true class action, without requiring class members to opt in, just as the District Court and the Federal Circuit Court of Appeals had done in *Alaniz*.

36. The third case was filed in the United States Claims Court in 1986 as *Arana v. United States*, No. 389-86C (Fed. Cl.), after OPM persisted in following certain aspects of its COLA methodology which the class in *Alaniz* had challenged as being contrary to both economic science and Congressional intent. (The *Alaniz* district and appellate courts ruled for plaintiffs without reaching those substantive issues.) Essentially, OPM had continued to employ what it called a "volume seller" methodology, in which prices were compared for dissimilar goods. For example, the evidence in *Alaniz* had shown that the biggest-selling men's suits in Anchorage were made of polyester, while the biggest-selling men's suits in Washington, D.C., were made of wool and were priced well above the polyester suits favored in Anchorage. On this evidence, OPM had concluded that the price of men's suits in Anchorage was lower than their price in Washington, D.C., by 11%, and had used evidence of this kind to reduce COLA rates in Anchorage. In fact, as the plaintiffs' evidence in *Alaniz* had shown, the same suit, be it made of polyester or of wool, was always more expensive in Anchorage. The obvious nonsense of OPM's volume-seller methodology was finally corrected in a settlement reached in 1988, pursuant to which OPM agreed to institute a COLA methodology which "will provide for a comparison of the prices of goods and services of closely similar quality and quantity, specifying brand, model, size, and other objective criteria wherever possible." The *Arana* settlement also required a detailed procedure for instituting the required changes in methodology, and it included a lump-sum payment in exchange for waivers of various claims.

37.     The fourth case, which like *Alaniz* stands as a landmark in administrative law, was *Caraballo v. United States,* No. 1997-CV-27 (D. V.I.).  The *Caraballo* case was filed in the United States District Court for the Virgin Islands in 1997, and it became the vehicle for one of the largest class action settlements in history.  The settlement was concluded in the year 2000 after a three-year process of collaboration and negotiation, initially opposed by OPM, called the Safe Harbor Process.  In addition to back pay for COLA underpayments after September 30, 1990 (the date through which underpayments of COLA had been waived in *Arana*), the *Caraballo* settlement provided for a wholesale revision of the COLA methodology.  The most important change was in OPM's interpretation of the term "living costs" in the COLA statute.  The parties agreed that living costs are so much higher in non-foreign areas than in the contiguous United States not only because of higher price levels but also because of the need for additional goods and services, which are required to maintain the same living standards as enjoyed by federal employees in all other parts of the United States.  Accordingly, beginning October 1, 2000, the settlement required a certain number of points to be added to the price index used in setting COLA rates.  (Previously, in published regulations, OPM had stated incorrectly that it did not have legal authority to make such a change.)  This change ended one recurring violation, first by the Civil Service Commission and later by OPM, of the same 1948 statute underlying the retirement claims in the present case.

38.     As in the earlier cases, the back pay distribution in *Caraballo* was managed by Robert G. Mullendore, P.S., as trustee for the class, which consisted of over 100,000 current and former employees.  The District Court stated in a 2005 order:

> The trustee and the attorneys for both sides have done an exemplary job throughout this case, and the implementation of the settlement has been carried out with remarkable precision and unprecedented success. . . . The deadline for submitting back-pay claims was extended by the trustee in his discretion, benefiting hundreds of class members, and numerous problems related to data submitted to the trustee by the Government were overcome.  Not a single dispute was submitted to the

13

Court or required the Court's intervention. . . . The success of this distribution has greatly exceeded the expectations of all concerned.

**Remedies**

39. Plaintiffs, on behalf of themselves and the Class, hereby pray for the following relief:

    a. A partial judgment requiring Defendant to pay, to the trust established pursuant to *Caraballo v. U.S.*, Civil No. 1997/27 (D. V.I. 2000), a lump sum amount equal to a reasonable estimate of the aggregate of all amounts of back pay, interest, attorney fees, and costs due to Class members, as of the partial judgment date, on account of the laws set forth in Count One of this complaint, including provisions requiring Defendant to prevent further violations of such laws from occurring after the date of the partial judgment;

    b. A partial judgment requiring Defendant to pay, to the trust established pursuant to *Caraballo v. U.S.*, Civil No. 1997/27 (D. V.I. 2000), a lump sum amount equal to a reasonable estimate of the aggregate of all amounts of back pay, interest, attorney fees, and costs due to Class members, as of the partial judgment date, on account of the laws set forth in Count Two of this complaint, including provisions requiring Defendant immediately to increase the amounts of annuities paid to current annuitants and to include COLA in the retirement base of all employees retiring after the date of the partial judgment;

    c. A permanent injunction requiring Defendant and its agencies henceforward to comply with applicable laws, so that discrimination of this kind does not recur. To reduce the risks of noncompliance, the injunction should require Defendant and its agencies (*i*) to provide substantial and effective opportunities for Class members

        and Class counsel to submit comments or objections prior to any decision to publish a proposed rule, if the rule concerns, interprets, or regulates any aspect of the legal rights of Class members with respect to salaries, annuities, and benefits, and (*ii*) to respond promptly and constructively to any recommendations by Class counsel for amendment or rescission of rules, or for issuance of new rules, concerning federal employment in non-foreign areas.

d.     Such other relief, at law or in equity, as is deemed just and equitable by the Court.

**Alternative Remedies**

e.     Instead of the partial judgment described in subparagraph (a), a partial judgment requiring Defendant to make a separate payment, to the undersigned attorney, and for each member of the Class, of a lump sum amount exactly equal to the aggregate of all amounts of back pay, interest, attorney fees, and costs due to the Class member, as of the date of payment, on account of the laws set forth in Count One of this complaint, including provisions specifying the schedule for such payments and requiring Defendant to prevent further violations of such laws from occurring after the date of the partial judgment;

f.     Instead of the partial judgment described in subparagraph (b), a partial judgment requiring Defendant to make a separate payment, to the undersigned attorney, and for each member of the Class, of a lump sum amount exactly equal to the aggregate of all amounts of back pay, interest, attorney fees, and costs due to the Class member, as of the date of payment, on account of the laws set forth in Count Two of this complaint, including provisions specifying the schedule for such payments and requiring Defendant immediately to increase the amounts of annuities paid to

current annuitants and to include COLA in the retirement base of all employees retiring after the date of the partial judgment.

DATED this 1st day of March 2023.

By s/ Robert G. Mullendore

Robert G. Mullendore
ROBERT G. MULLENDORE, P.S.
310 West Spruce Street
Missoula, Montana
406-239-8300
bob@rgmlaw.com

MAILING ADDRESS:
Robert G. Mullendore, P.S.
P.O. Box 7187
Missoula, MT  59807

*Attorney for Plaintiffs*

Robert K. Baldwin
BALDWIN LAW FIRM
P.O. Box 10850
Bozeman, MT  59719
406-551-9993
rbaldwin@baldwinlawfirm.com

*Of counsel*